period gives evidence of one irrational act, of a delusion, or of one fact which tends to suggest, much less to prove, testamentary incapacity. Every one of these witnesses testifies to the conversations held with him and to his soundness of mind. Nor do the provisions of the will itself shock the mind, so as to lend color to the suggestion of mental infirmity. The will, while it diverts the property from what may be called its natural channel, his lawful family, and bestows it upon the woman with whom for many years he had been living without the sanction of law, yet cannot be said to be unreasonable. He had been entirely separated from his wife for many years. The youngest of his children was 30 years of age. His daughters he never saw; his sons but seldom. This woman had been recognized by his world as his wife. She had been true and loyal, he said, for 34 years. She had devoted her life to him, and had been accepted by his parents. His last care was for this life companion, illicit though the relation was. We are not called upon to approve his morals or sanction his mode of life. The law, which alone we are to expound, is, that a man, irrespective of his moral character, being of sound and disposing mind, not moved by undue influence and not under restraint, may, if he observes the formalities of the law governing the execution of a last will and testament, dispose of his property as he will. The verdict rendered upon the evidence in this case was against the weight thereof, and must be set aside.

Judgment and order reversed, and a new trial ordered, with costs to appellants to abide the event. All concur; PATTERSON, J., in result.

---

(110 App. Div. 108.)

### KEATING v. MANHATTAN RY. CO.

(Supreme Court, Appellate Division, First Department. December 30, 1905.)

1. MASTER AND SERVANT—DEATH OF SERVANT—ELEVATED RAILROADS—OPERATION—FELLOW SERVANTS.

   Where plaintiff's intestate, engaged by defendant elevated railroad company in inspecting and cleaning switches, was run into and killed by an engine crossing from one track to another, because of the negligence of the engineer in charge of such engine, in operating the same at an excessive rate of speed, the engineer's negligence was that of intestate's fellow servant, for which defendant was not liable.

   [Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 500.]

2. SAME—RULES.

   Defendant elevated railroad company promulgated rules requiring its engineers to use special care in coupling and shifting cars to avoid injuring trainmen, limiting the speed to six miles an hour in crossing switches, and charging the engineer with the duties of a conductor when the engine was running over any portion of the road without a conductor. *Held*, that such rules were sufficient to protect a switch inspector from being struck by an engine being shifted over switches from one track to another, and that defendant was not liable for the inspector's death by an engineer's operation of his engine at a rate of speed exceeding that specified, because of defendant's failure to promulgate additional rules.

3. SAME—CONTRIBUTORY NEGLIGENCE.

   Intestate, who had been an elevated railway employé for nine years, about a month prior to his death was employed as a switch inspector at

the terminus of one of defendant's lines, and was killed by being struck by an engine crossing from one track to the other. There was no evidence that he did not see the engine approaching, or that his attention was diverted, and it was plain that a man standing on a track as plaintiff was, on which engines were constantly passing and repassing, could have seen the engine in question in time to have escaped, by the exercise of ordinary care. *Held,* that intestate was guilty of contributory negligence as matter of law precluding recovery for his death.

Patterson, J., dissenting.

Appeal from Trial Term, New York County.

Action by Maria Keating, as administratrix, etc., of John Keating, deceased, against the Manhattan Railway Company. From a judgment in favor of plaintiff, and from an order denying defendant's motion for a new trial, it appeals. Reversed.

Argued before O'BRIEN, P. J., and PATTERSON, CLARKE, INGRAHAM, and LAUGHLIN, JJ.

John F. McIntyre, for appellant.

Reno R. Billington, for respondent.

INGRAHAM, J. The plaintiff's intestate was in the employ of the defendant, and it was his duty to sweep out certain switches upon the defendant's tracks, to keep cinders and ashes from accumulating upon the switches and to keep them in working order. He was required to perform this duty at the end of the defendant's road between 130th and 140th streets. It was also his duty to inspect these switches every day and in bad weather two or three times a day. He had been employed by the defendant for several years and at this particular work for some weeks. On the 11th of February, 1902, while engaged in working on the track of the defendant's road between 135th and 136th streets, he was run over by an engine operated by the defendant's employés and killed. The complaint alleged that the defendant was negligent, "in that its servants and agents so operated said engine as to knock down, run over, and kill the said John Keating, deceased, and that the defendant was also guilty of negligence in that it carelessly and wrongfully omitted to make and promulgate rules for the guidance and direction of its employés, which were sufficient for the protection of men in its employ, and especially the men engaged as trackmen in sweeping and switching on its tracks, and particularly the said John Keating, deceased, who was so employed by defendant at the time he received said injuries, but, on the contrary, made and promulgated rules that were insufficient and improper, and by reason thereto the said John Keating, deceased, was injured as aforesaid and was killed thereby; that the defendant was also negligent, in that it failed to provide a safe and proper place for the deceased, John Keating, to work, and also in that it failed to supply a safe or proper means for the said John Keating, deceased, to escape injuries from an approaching engine."

Upon the trial the plaintiff seems to have rested her case upon the failure of the defendant to make and promulgate rules that were sufficient for the protection of the men in its employ; and the only question that the learned trial judge submitted to the jury was the question of the defendant's negligence, whether the rules and regula-

tions introduced in evidence afforded ample security to its employés. The accident happened near the termination of the defendant's line of elevated railroad on Eighth avenue. The motive power in use on defendant's line at that time was locomotives. There were three tracks on the road. Two side tracks were used for making up regular trains, while the middle track appears to have been used for locomotives. The method of making up the trains seems to have been as follows: When a train from downtown drew up to the station, the engine at the head of the train was disconnected and then switched to a middle track and run down to a position in front of the cars of the succeeding train. When the succeeding train drew into the station, the engine was backed across the switch onto the main track and connected with the front car of the train about to proceed downtown. The switches at that point in this yard were operated to allow this engine to be switched from the track on which the train had come uptown to the middle track, and thence again to the side' track to enable it to connect with the train that was to proceed downtown. It was the intestate's duty to inspect these swiches from one to three times a day, to sweep them out and to keep them in proper order. According to the plaintiff's testimony, at the time of the accident the plaintiff's intestate was working on the center track between the switches. A train dispatcher had signaled this engine to take its position to connect with the next train, and he testified that he noticed this engine come up at an excessive speed, which he assumed at about 18 miles an hour; that when the engine struck him the deceased was standing, his left side to the engine, with a broom, sweeping alongside of the track; that he must have been standing right on the rail, or close to the rail; that he heard no signal given by the engineer. The witness was then handed a book of rules promulgated by the defendant, which had been introduced in evidence, and was asked whether there was any rule in the book which regulates switchmen and yardmen while working as was deceased at the time of the accident; and in answer to the question the witness said he did not know of any particular rule, but further stated that there was a rule which required engineers to run at a certain rate of speed over switches and through the yards; that there was no bell on top of the engine. These rules were in evidence before the jury.

The first question presented is whether the rules promulgated by the defendant were reasonably sufficient for the protection of its employés working on these tracks? It is quite evident that if the defendant had promulgated sufficient and proper rules for the safety of its employés, and these were enforced by the officers of the road, that there is no evidence justifying a finding that the defendant was negligent; and any negligence of the engineer or other employé was negligence of a fellow workman, for which the defendant was not responsible. The rules are stated to be "rules and regulations for the government of the operating officers and employés of the Manhattan Railway Company." They provide that officers and employés must remember that, in accepting office or position in the service of the company, they are bound thereby to obey strictly the rules and regulations issued by their superior officers. Rule 12 provides that the regular compensa-

tion of employés covers all risks of and liability resulting from accident. Rule 18 provides that employés must familiarize themselves with the rules governing the department to which they belong. Entrance into the service of the company implies acceptance of its rules and regulations. Rule 21 provides that disobedience of orders, violation of rules, or neglect of duty will always be considered a sufficient cause for dismissal; but suspension from duty and pay may be substituted. The rules then provide for the government of engineers. Rule 116 provides that they must use special care in coupling and shifting cars to avoid injuring the trainmen, and must always start and stop their trains cautiously and without sudden jerking. Rule 131 provides that they shall keep a constant lookout ahead when the engine is in motion, observe the position of all switches, and, if there be semaphores or targets, see that they indicate that switches are properly adjusted. If wrong, the engine or train must be stopped at once. Rules are then provided for the regulation of trains, which are entitled "Train Rules." Rule 260 provides:

"Trains will not be allowed to exceed a speed of 6 miles per hour in rounding sharp curves or crossing switches, and 12 miles per hour on descending heavy grades."

Rule 261 provides that the maximum speed must not exceed 25 miles per hour, but this will never be used while descending heavy grades, or while passing any switch or frog. Engineers and conductors will confine the speed of trains within the maximum and according to the rules. Rule 263 provides that care must be taken to control the speed of trains at stations, terminals, junctions, curves, and crossings, particularly in foggy and stormy weather, and all trains must come to a full stop at junctions before crossing. Rule 267 provides that, whenever an engine is run over any portion of the road without a conductor, the engineer thereof will be regarded as conductor and will act accordingly. Rule 375 provides that every employé must exercise constant care and watchfulness to prevent injury to persons and property. In every case of doubt, take the safe side and run no risk. Rule 390 provides that successive short sounds of the whistle will be used as a danger warning to persons on the track, and notifies the trainmen of danger ahead. They will quickly aid in stopping the train.

The deceased was employed to perform work on the track and switches, with trains constantly passing. His duty was confined to the examination of these switches one, two, and three times a day, and cleaning them out when they became blocked from dust, cinders, or snow. Not being employed at any particular place upon the track, it was obviously impracticable for the defendant to provide a watchman to warn him of the approach of trains if he happened to be at switch making his daily inspection. Nor can it be said that the defendant was bound to contemplate that an employé who had been many years in its service, familiar with the work he had to do, would need to be protected when inspecting switches and cleaning them out. It was not the case of a body of men set to work on a particular track where trains were constantly passing, and whose work would prevent them from watching for the approach of trains; but a man

charged with the duty of inspecting and examining the track and switches of the road. The rules to which attention has been called would seem to be all that was practicable for the protection of men charged with the duty of inspecting and caring for the switches. The engineers were expressly required to use special care in coupling and shifting cars to avoid injuring the trainmen, and trains were not to exceed six miles per hour in rounding curves or crossing switches. And the engineer was charged with the duty of a conductor when the engine was running over any portion of the road without a conductor. Whether, technically speaking, an engine alone would be considered a train, the object of this rule is apparent; and an engineer reading it would certainly understand when he was running an engine alone, and that he must obey these orders, which were train rules.

We cannot see that any other rules could have been added which would have protected this deceased, and it is quite clear that if these rules had been obeyed, and the engineer had confined the speed of his engine to six miles per hour and kept his engine in hand crossing this curve, and if the plaintiff's testimony is true as to the cause of the accident, it would never have occurred. If the testimony given by the plaintiff is true, these rules were disobeyed by the engineer in running his engine at an excessive rate of speed over these switches, and the accident was due to his negligence—the negligence of a fellow servant, for which the defendant was not responsible. I do not think, therefore, that there was any evidence that justified a submission of the question to the jury.

If, however, I am wrong in this, it is apparent that there is no evidence to justify the finding that the deceased was free from contributory negligence. He had been in the employ of the defendant for upward of nine years, and had been at work at this particular point about a month. His duty pertained to the track of the road and it is evident that he must have been perfectly familiar with the management of the road and the method in which these trains were made up. He knew that engines were constantly crossing on this middle track. This engine in question came down in full view, with nothing to obstruct his seeing it in time to step from the track and avoid the injury. There is no evidence to show why he did not see the engine, nor is there any excuse given, or any fact from which the jury could find that his attention was diverted, so that he could not see the approaching engine. The danger of being struck by an engine provided he was upon the track was quite apparent; and while on the track, engaged in this work, he was charged with the caution a prudent man would exercise, and required to keep a watch for the engines as they went to and fro in making up the trains. But certainly a man standing upon a track and allowing himself to be run over by an engine, without taking any care to avoid such an accident, and with no possible excuse for his not seeing the approach of the engine, cannot be said to be free from contributory negligence. There was, I think, error in receiving expert testimony, but that need not be considered. I think upon the whole case there was no evidence which justified a finding that the defendant was negligent or that the deceased was free from contributory negligence.

The judgment and order appealed from should therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event.

LAUGHLIN and CLARKE, JJ., concur.

O'BRIEN, P. J. I concur on the ground that plaintiff did not sustain the burden of showing freedom from contributory negligence on the part of deceased.

PATTERSON J., dissents.